IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,

                                              Criminal No. 09-0048
                                             **ELECTRONICALLY FILED**

    v.

YOUA VUE,

        Defendant.

**ORDER OF COURT DENYING DEFENDANT'S
MOTION TO SUPPRESS STATEMENTS (DOC. NO. 52)**

**Introduction**

Defendant is charged with being a convicted felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). The Indictment charges that "on or about July 30, 2008, in the Western District of Pennsylvania," defendant, "after having been convicted on or about February 19, 1998 in the United States Court for the District of Minnesota, of the crime of conspiracy to manufacture a firearm, a crime punishable by imprisonment for a term exceeding one year, did knowingly possess in and affecting interstate commerce a Model 500C, 20 gauge, Mossberg shotgun." Doc. no. 1.

Before the Court is defendant's Motion to Suppress Statements (doc. no. 52) he made on July 30, 2008, February 13, 2009, and May 13, 2009, on the grounds that those statements were obtained in violation of Mr. Vue's rights guaranteed by the Fifth, Sixth and Fourteenth Amendments to the United States Constitution. Defendant filed a response to said Motion (doc. no. 62). After carefully considering both submissions, this Court held a suppression hearing on June 30, 2010. Doc. no. 85.

**Suppression Hearing**

At the start of the suppression hearing, counsel for the Government informed the Court that it would not seek to use the July 30, 2008 and February 13, 2009 statements except for impeachment purposes. See Notes of Testimony ("NT") at doc. no. 86 p. 3. However, because the Government did intend to use the third statement, the one made on May 13, 2009, it presented evidence with respect to the May 13, 2009 statement. *Id*. Defense counsel had no objection but reserved the right to object should the Government attempt to use the July 30, 2008 and February 13, 2009 statements during trial. *Id*., p. 4. Accordingly, this Court denied defendant's Motion to Suppress Statements as moot as to the first two statements (*i.e.* the July 30, 2008 and February 13, 2009 statements) but granted defendant the right to renew their Motion to Suppress these two statements should the Government choose to use either or both of those statements at trial. *Id.*

**Testimony Taken during the Suppression Hearing**

After dispensing with preliminary matters, this Court conducted a suppression hearing on defendant's Motion to Suppress (doc no. 52 ) on the sole remaining statements – those uttered by defendant on May 13, 2009. *Id*. The statements defendant made on that date were expressed in the presence of Derek Berger, a Deputy United States Marshal and member of the Western Pennsylvania Fugitive Task Force, who testified at the hearing. *Id*., pp. 8-35. Importantly, Deputy Berger's sole function was to arrest and transport the defendant – not investigate any crimes.

As explained by Deputy Berger, the Fugitive Task Force is comprised of ten or eleven members, six of which normally are Deputy United States Marshals, and is run by the United

States Marshals Service. County sheriffs, city police, a state parole agent and a state trooper comprise the remainder of the task force. *Id*., p. 8. The purpose of the Task Force is to look for fugitives in city cases as well as federal cases.[1] *Id*., pp. 8-9.

Deputy Berger described his overall interaction with defendant as follows:

[BY GOVERNMENT'S COUNSEL]

Q. Can you explain for us what occurred after you arrived
with the Fugitive Task Force at 52 McKnight Street on
May 13th.

[BY DEPUTY BERGER]

A. We arrived there -- I guess it was roughly eight in the
morning. It was my case. I went to the door with the members
of the task force surrounding the house, the perimeter of the
house. I went to the door and knocked.
A man answered the door. I believed it to be Vue's
brother. I asked for Youa Vue, and he said he wasn't there.
I said we had reason to believe he was in there, could we
search. He said come on in.
So as we went in the house, standard procedure, it
being my case, I actually stayed with him and was questioning
him because he told us he wasn't there -- Mr. Vue wasn't
there. And the rest of the task force started to search.
Roughly three to five minutes later I could hear the
task force guys that were on the second floor calling him out,

---

[1] Defendant was considered to be a fugitive in this case for the following reasons: On February 13, 2009, subsequent to his arrest in this matter, defendant appeared on before United States Magistrate Judge Lenihan, an unsecured appearance bond was set, and defendant was released but was restricted to travel within Western District of Pennsylvania and placed on home detention. Doc. nos. 9-11. The arraignment, originally scheduled for February 18, 2009, was continued to March 20, 2009, at the request of defendant's counsel because defendant had checked into an in-patient rehabilitation facility. Doc. no. 14. On March 4, 2009, the probation officer filed a petition indicating that defendant had not cooperated while at the rehabilitation facility and was discharged by the facility on March 3, 2009. Doc. nos. 16, 18. Defendant failed to report to his probation officer and failed to return home to be placed on home detention under electronic surveillance. *Id*. Finding that defendant had absconded, this Court issued a warrant for his arrest on March 6, 2009. Doc. no. 17. Defendant was thus considered to be a fugitive.

>    and then they -- they got Mr. Vue in custody.
>
>    Q. Okay. Explain for us, then, what happened after
>    Mr. Vue was taken into custody -- I assume on the second floor
>    of the residence.
>
>    A. They got him in custody, he comes down the stairs --
>    they escort him down the stairs. We go outside; and also kind
>    of standard procedure, as they put him in custody, he's
>    handcuffed behind his back. When we go to transport him, we
>    will switch him out with the belly chain, put his hands in
>    front of him; so we did that, put him in the car to transport
>    back here for processing and initial appearance.

*Id.*, pp. 9-10.

According to Deputy Berger's testimony, the defendant's statements took place during the transport.

>    BY [GOVERNMENT'S COUNSEL]
>    Q. Let me begin to -- again, I want to focus in on what
>    we're, you know, essentially here for today. Did you
>    participate in the transport of Mr. Vue from the location
>    where he was arrested to some other location?
>
>    A. Yes. From -- from the West End, from 53 McKnight
>    Street, when we were bringing him here to the courthouse for
>    processing.
>
>    Q. And how long, based upon your knowledge of the area,
>    would it take to drive from that location to the courthouse?
>
>    A. Roughly ten minutes.
>
>    Q. Okay. And how was he transported from that location to
>    the courthouse?
>
>    A. It was in -- I was driving a Chevy Astro van, a caged
>    vehicle. He was put in the back; and then as we were driving,
>    he -- he made this statement.
>
>    Q. Okay. Let me -- prior to asking you what statement he

4

made, explain for us whether there was anyone else in the vehicle during the transport.

A. Deputy Moorehead was with me in the passenger seat.

Q. Okay. And while you were transporting Mr. Vue, were you or Deputy Moorehead having any conversation with him or was he making, you know, any statements back to you or anything of that nature?

A. No. There was no conversation. I know I was -- I didn't -- I wasn't talking. I didn't want to say anything. I had an informant in this case, which I was, I don't know, being extra quiet because I didn't want to bring up any knowledge -- usually when we arrest people, they are usually saying: How did you get me? How did you know I was here? How did you know I was in Pittsburgh.
But none of that was said, and I wasn't -- I don't believe me and Joe or Deputy Moorehead were even talking to each other.

Q. Okay. Did Mr. Vue make a statement at any point during the transport to the courthouse?

A. Yes. He said: You guys didn't give me enough time to get to my AK.

Q. Okay. And what was your response to that?

A. I just said: What do you mean by that?

Q. And what was his response to your question?

A. He said: I have guns all over the place.

Q. Okay. Up until the point that he made the first statement about the AK, was that -- I want to make sure we are clear on this. Was that preceded by any question or statement whatsoever by yourself or Mr. Moorehead?

A. Not at all. Not at all.

Q. And when the statement was made about the AK, did you

>know specifically to what Mr. Vue was referring to?
>
>A. I did not.
>
>Q. Why did you ask him the question of what did he mean?
>
>A. I mean it was -- it was -- there was not a conversation going on, and he just; he threw that out there. I just simply asked him what he meant by that.
>
>Q. Because at that point you didn't know what he meant by it.
>
>A. I didn't know what he meant.
>
>Q. Okay. After he made the response then about having guns all over the place, did you continue then to speak with Mr. Vue during the transport?
>
>A. No.
>
>Q. Did he make any other statements during the transport that you can recall?
>
>A. No.

*Id*., pp. 12-14.

On cross-examination, when asked about the interaction that occurred between Deputy Berger and defendant before and during transport, the deputy expounded as follows:

[BY COUNSEL FOR DEFENDANT]

>Q. Okay. Did you advise him or speak with him at all when you first interacted with him at the house?
>
>A. No.
>
>Q. Did you tell him why he was being arrested?
>
>A. No, I don't believe so.

Q. Could you have?

A. I guess I could have, but that's not -- I mean -- the Fugitive Task Force, the way we work -- I mean when we go in, everybody knows they got warrants. Nobody ever questions as to why they're getting arrested. They know why they're being arrested.

Q. So nobody to your knowledge ever told him: You're being arrested for a pretrial release violation, having absconded, or anything like that.

A. To my knowledge, no; I don't recall that being said or done.

Q. Okay. Did the Defendant say anything during your interaction with him at the house?

A. I don't recall.

\*     \*     \*

Q. You left 53 McKnight Street -- that's on the west side, correct, west side of Pittsburgh?

A. It's in the West End.

Q. It's not a very long drive, then, is it, from the West End to the federal courthouse, where you brought the Defendant, correct?

A. Not at all. Like I said, ten minutes roughly.

Q. And what time, approximately, did you leave the house?

A. I believe I -- 8:15 I believe is when the arrest happened, so maybe we left at 8:20.

Q. And you came directly to the federal courthouse, correct?

A. Correct.

Q. Okay. I take it through this time the Defendant was not struggling, he wasn't resisting, he was behaving himself appropriately, is that fair to say?

A. That's fair to say.

Q. Okay. Was there any discussion between you and Deputy Moorehead -- forgive me -- Moorehead, Joseph Moorehead regarding the circumstances of him being under this clothing, under these various garments, for lack of a better term, prior to the Defendant saying anything?

A. No. I -- I mean I was in the living room. I know Deputy Moorehead was on the perimeter. So he wasn't -- he never went in the house, so he didn't see it. He didn't know of it and we didn't speak of it.

Q. Well, did Deputy Moorehead joke with the Defendant, whether he learned of it through direct observations or some other source, that, geez, this guy thought he was hiding and his feet were hanging out. Was there anything like that or even close to that?

A. No.

Q. Okay. Now, you said the Defendant said what with respect to the AK? Could you repeat his remarks, please?

A. It was -- it was: You guys didn't give me time to get to my AK.

Q. Did he say it audibly or did he say it half silently? I mean what was the tone of this?

A. I mean he said it -- the tone, it was like -- like he was angry with us, like.

Q. Was it said with bravado, that he was kind of joshing with you, joking, like that, that he was daring you, kind of -- challenging you, that: You found me but, a-ha, I have one up on you? Was it that kind of thing?

A. No, he wasn't joking. His demeanor -- I kind of took

it to be angry, upset.

Q. You didn't take it seriously, did you? You didn't go out and look for an AK-47 at that moment, right?

 A. Nope.

Q. Was there any -- any suggestion, too, that the Defendant had an AK-47 or any other number AK prior to that remark?

A. I mean did -- are you asking if we found one –

Q. Did the informant tell you or did you hear anything from law enforcement that you thought the guy might have an AK-47?

A. No, I don't believe the informant told me, you know, that. I mean we knew he had two prior gun cases.

Q. Right. We talked about that, but there was nothing specific about the Defendant having an AK-47, right?

A. Right.

Q. And there was nothing -- pardon me, there was nothing that you learned after you transported the Defendant to the Marshals Office that he had an AK-47 at any time, correct?

A. Correct.

Q. Okay. Now, again, you knew the Defendant was charged with a firearm offense for which he is in court today, right?

A. Right.

Q. And you know what an AK-47 is, right?

A. Correct.

Q. There are various versions of it, but it's essentially a Russian assault type rifle that was produced for a lot of years by the former Soviet Union, right?

A. Correct.

Q. Okay. Now, you don't know of any drugs called AK, do you?

A. Off the top of my head, no.

Q. And you don't know of any medical treatment or medical condition called AK, do you?

A. Top of my head, no.

Q. Okay. So when the Defendant said AK, you thought he was referring to a firearm, right?

A. You know, he -- he said it and I just simply asked what he meant by that.

Q. All right, but you had to have some thought that went through your mind before you said something, right? You thought he was referring to a firearm, correct?

A. I do not know. I simply said: What do you mean by that? I mean -- I don't know.

Q. Well, you're a law enforcement officer, right?

A. Correct.

Q. Your job is primarily to handle security at the courthouse, to apprehend fugitives, but you're in general a law enforcement officer, right?

A. Correct.

Q. And you have training about firearms and you know generally -- you've heard the term AK-47, as you testified, right?

A. Right.

Q. So isn't it true that you thought the Defendant was

talking about an AK-47 and that's why you asked him further about what he meant?

A. No. I mean I -- it was -- he just made a comment, coming from the back. I mean I'm driving the car, and I just said: What do you mean by that? I didn't know. I did not know where he was going with it or -- I simply said: What do you mean. I mean --

Q. There wasn't much pause between when he said AK and you responded, right?

A. There was no pause, yeah; I just asked: What do you mean by that?

Q. You went right after him with a direct question about what he meant, right?

A. Yes.

Q. And he said in response: I have guns all over the place.

A. Correct.

Q. And you didn't ask him further about anything else?

A. No. I did not.

Q. You didn't conduct any further investigation about what he meant?

A. No. I mean -- on a -- we're a fugitive task force; we don't question people. We -- I mean we -- we don't Mirandize people. We're going after them, they've got warrants already, so –

Q. You didn't talk to the US attorney and say: Hey, you might want to think about getting a search warrant, he's talking about guns all over the place. Maybe you should go back in there. Nothing like that occurred, right?

A. Well, I mean I did put it in my brief arrest report.

> Q. Right. You prepared a report concerning the arrest of the Defendant, right?
>
> A. Right.
>
> Q. And that was in it, but that was the extent of it, right?
>
> A. That was the extent of it.
>
> Q. And that report you prepared was prepared the next day, correct?
>
> A. Yes.
>
> Q. Okay. The only other person to have witnessed the exchange regarding the AK-47 and the guns was this Detective -- or, I'm sorry, marshal, Deputy marshal Moorehead, correct?
>
> A. Correct.

*Id.*, pp. 25-26, 28-34.

**Governing Standards**

The Fifth Amendment of the United States Constitution guarantees that, in a criminal proceeding, no person will be forced to be a witness against himself. U.S. Const. Amend. V. To this end, the United States Supreme Court created the *Miranda* warnings for law enforcement to follow prior to custodial interrogation of a suspect. *Miranda v. Arizona*, 384 U.S. 436 (1966). Specifically, before any custodial questioning, the suspect must be informed that "he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id.* at 445. These "warnings are constitutionally required to combat the compelling pressures inherent in custodial

police interrogation and to permit a full opportunity to exercise the privilege against self-incrimination" guaranteed by the Fifth Amendment. *Dickerson v. United States*, 530 U.S. 428, 440 (2000). Statements obtained in violation of *Miranda*, even though they may be voluntary, are inadmissible to prove guilt at trial. See *Michigan v. Mosely*, 423 U.S. 96, 100, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975); *Miranda,* 384 U.S. at 458-59.

On a colorable motion to suppress statements as involuntary, the government must bear the burden of proving, by a preponderance of the evidence, that a defendant was properly advised of his Miranda rights; that the defendant voluntarily, knowingly, and intelligently waived said rights; and that the ensuing statement was voluntary. *Colorado v. Connelly*, 479 U.S. 157, 169 (1986). "A defendant may waive his Miranda rights if the waiver is made knowingly, intelligently, and voluntarily." *United States v. Pruden*, 398 F.3d 241, 246 (3d Cir. 2005). To determine that a waiver was voluntary, knowing and intelligent, two factors must be shown:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.

*Moran v. Burbine*, 475 U.S. 412, 421 (1986).

"The voluntariness of a waiver of [the Fifth Amendment] privilege has always depended on the absence of police overreaching, not on 'free choice' in any broader sense of the word." *Connelly*, 479 U.S. at 170 (reasoning that the Fifth Amendment is solely concerned with protection from governmental coercion). Either physical or psychological coercion by law enforcement may render a Miranda waiver involuntary. *Miller v. Fenton*, 796 F.2d 598, 604 (3d Cir.1986). In this regard, a promise by a law enforcement officer may qualify as coercion.

*United States v. Walton*, 10 F.3d 1024, 1030 (3d Cir. 1993); *United States v. Conley*, 859 F.Supp. 830, 836 (W.D.Pa. 1994) (collecting cases). Similarly, police words or deeds that are likely to cause a suspect to believe he will suffer serious adverse consequences if he does not cooperate, or will receive substantial leniency if he does, can render a confession involuntary. See *Walton*, 10 F.3d at 1029-30 (agent's promise that defendant could speak "off the cuff" would be understood by a suspect to mean that defendant's statements would not be used against him, rendering confession involuntary); *United States v. Veilleux*, 846 F.Supp. 149, 154-55 (D.N.H. 1994) (confession held involuntary when defendant was told that nothing he said would be used against him); *United States v. Kontny*, 238 F.3d 815, 818 (7th Cir. 2001) (investigator's promise that a suspect would not be prosecuted if he played ball could be the kind of false promise that would overcome the suspect's free will).

To determine the sufficiency of Miranda warnings and any waiver of rights, the Court examines the totality of the circumstances surrounding the questioning. See United States v. *Velasquez*, 885 F.2d 1076, 1086 (3d Cir. 1989); *Arizona v. Fulminante*, 499 U.S. 279 (1991). In analyzing the totality of the circumstances, a court "must look at the facts of the particular case, including the background, experiences, and conduct of the suspect." *Id.* at 1086. Potential circumstances affecting the voluntariness of the statements include: 1) evidence of police coercion; 2) the length and location of the interrogation; 3) the defendant's maturity, physical condition, mental health and level of education; 4) whether Miranda warnings were given; and 5) whether an attorney was present for the interview. See *United States v. Swint*, 15 F.3d 286, 289 (3d Cir. 1994).

A statement may be the product of police overreaching even after a defendant has been

14

advised of and validly waived his Miranda rights. See *Dickerson*, 530 U.S. at 444 (acknowledging that the administration of Miranda warnings does not dispense with the requirement that a statement be made voluntarily). However, "cases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of Miranda are rare." *Berkemer v. McCarty*, 468 U.S. 420, 433 n. 20 (1984); *Dickerson*, 530 U.S. at 444 ("The requirement that Miranda warnings be given does not, of course, dispense with the voluntariness inquiry."). An express written statement of a waiver is strong proof as to the validity of a waiver, of course, but a waiver may also be made orally or implied from a defendant's conduct. *North Carolina v. Butler*, 441 U.S. 369, 373 (1979).

A statement is involuntary when the suspect's "will was overborne in such a way as to render his confession the product of coercion." *Fulminante*, 499 U.S. at 288. Where a defendant challenges the voluntariness of a statement under the Due Process Clause of the Fifth Amendment, "the prosecution must prove at least by a preponderance of the evidence that the confession was voluntary." *Lego v. Twomey*, 404 U.S. 477, 489 (1972); see also *United States v. Jacobs*, 431 F.3d 99, 108 (3d Cir. 2005).

**Discussion**

**1.     No Custodial Interrogation Took Place**

As noted above, before any custodial questioning, the suspect must be informed that "he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Miranda*, 384 U.S. at 445.

Here, defendant was in custody – he was aboard the van being driven by law enforcement officers whose sole function was to arrest and transport him. However, all evidence supports a finding that defendant was not being interrogated at the time he made the "AK" and "guns all over the place" statements on May 13, 2009. Thus, because defendant was not undergoing a custodial interrogation process at the time he made these statements, whether he was given his *Miranda* warnings is of no moment as to the "AK" and "guns all over the place" statements.

2.  **Statements Defendant Made on May 13, 2009 were Voluntary**

Based on the testimony of Deputy Berger, this Court finds that the statements uttered by defendant on May 13, 2009 were purely voluntary.

As Deputy Berger stated, he had little to no interaction with defendant until defendant was brought downstairs by other task force members and placed into Berger's vehicle for transport. Deputy Berger specifically stated he did not tell defendant why he was being arrested, he assumed he knew since he was a fugitive and it was his not role as a member of the Fugitive Task Force to give defendant his *Miranda* warnings or investigate any crimes.

As further explained by Deputy Berger, the ten-minute van ride from defendant's residence to the courthouse was permeated by silence until it was broken by defendant's impromptu and somewhat angry utterance that he did not have time "to get his AK". Neither Deputy Berger or his colleague, who also was present in the vehicle, questioned him before he made the "AK" statement. After making the "AK" statement, Deputy Berger spontaneously asked defendant, "What do you mean by that?" Per Deputy Berger, defendant responded " I have guns all over the place." Based upon Deputy Berger's testimony and his demeanor while testifying, this Court finds that Deputy Berger's question to defendant was not an "interrogation"

16

nor an attempt to begin an interrogation, but was a spontaneous response to a spontaneously made statement.

Moreover, after uttering the "AK" statement and the statement that he "had guns all over the place", Deputy Berger did not attempt to interrogate him to elicit any specific information as to where these purported caches of weapons may be located or stored, nor attempt to identify the number or type of weapons defendant to which defendant referenced. Deputy Berger did not contact anyone to suggest such an interrogation take place; rather he simply noted that these extemporaneous comments had been made on his report.

**Conclusion**

Considering defendant's familiarity with *Miranda* warnings given his prior arrests, his understanding that he was a fugitive, and that he voluntarily spoke in the presence of law enforcement authorities, including Deputy Berger, when no one was questioning him, this Court finds defendant's statements to have been voluntary, intelligent and with understanding of the consequences of any statements he might make. Moreover, the Court finds that although defendant was in custody, there was no "custodial interrogating" and so *Miranda* warnings were not required.

Accordingly,

AND NOW, this 1st day of July 2010, for the reasons set forth above, defendant's Motion to Suppress Statements (doc. No. 52) is HEREBY DENIED with respect to the statements defendant made on May 13, 2009. The Court further denies as moot defendant's Motion to Suppress Statements (doc. no. 52) as to the statements made on July 30, 2008 and February 13, 2009 statements, but grants defendant the right to renew this Motion to Suppress as these two

statements should the Government choose to use either or both of those statements at trial.




s/ Arthur J. Schwab
Arthur J. Schwab
United States District Judge


cc: all ECF registered counsel